James C. O’Brien, Off. Ref.
The synagogue of the above-captioned congregation and the land on which it was located were sold and conveyed on March 22, 1961, producing, after adjustments, net avails of $44,076.21. Phillip Cohen, Hyman Lapides, both deceased intestate, and Morris Flaum, still surviving, purchased seats or pews in the synagogue at various dates between 1920 and 1924 inclusive. The amounts paid were as follows: by Phillip Cohen, $117.50; by Nathan Lapides, $135, according to the recent book of the synagogue (the consideration expressed in the indenture was $115), and Bluma Flaum, $125. Morris Flaum, according to the indenture (Exhibit No. 15) was required to pay $165. He made some payments on account, aggregating $75, got into default, and, according to the records of the synagogue produced by its president, his seat reverted to the congregation and subsequently his wife, Bluma Flaum, made a bargain with the congregation by which, in consideration of her paying $50 additional, the seat for which her husband had originally contracted, was conveyed to her to be “ her property ’ ’. The total, therefore, paid for the Flaum seat, I find to be $125.
It was stipulated by Mr. Fix, as counsel for the congregation, that after investigation by Mr. Eber, counsel for the Flaum *1098 family, a letter from Mr. Eber to the Referee, setting forth the date of death of Bluma Flaum and the names and relationship of her distributees could be accepted by the Referee as proof of the facts stated in the letter, in lieu of sworn testimony on the subject. Such a letter has been received under date April 21, 1961. From that letter it appears that Bluma Flaum died in September, 1937, intestate. Her distributees are the following: her husband, Morris Flaum, who is still alive; five children, viz.: Esther Morganstern, Wolfe Flaum, Ziskin Flaum, Sarah Flaum, Jacob Flaum, and one grandchild, Ina Suher, only surviving issue of David Flaum, a deceased child of Bluma Flaum.
The claimants assert that the ancestor of each of them had a property right in and to their respective sittings and that since the building has been sold and demolished and the sittings destroyed, they are entitled to payment of indemnity for the value of the sittings.
The congregation takes the position that no property right was transferred or created by the respective indentures; moreover that since none of the claimants is a recognized dues-paying member of the congregation, all rights under the indenture have terminated and their application for payment should be denied.
Two of the indentures were received in evidence upon the trial (Exhibits 15 and 16). They are printed documents in which appropriate blanks have been filled in to specify the name of the grantee, the date of the indenture, the amount of the consideration and the location of the seat.
Each of these indentures closely resembles a deed of land. It is noted also that each of them was recorded in the County Clerk’s office of Monroe County at or about the time that they were executed and acknowledged. The form of the conveyance, the fact that they were acknowledged and recorded in the Monroe County Clerk’s office and their language effectually contradict the view asserted by the congregation and tend to support the claim of the various grantees, that they were granted a vested property right which entitles them to reimbursement.
Each of the indentures is stated to run for a term of 1,000 years (approximately only 40 years have already expired). The term of the lease or grant or conveyance is far beyond the reasonable life expectancy of any human being and negatives the view of the congregation that the grantees’ rights were to terminate upon their respective deaths.
Paragraph of the indentures designated “3” gives to the grantee the right to rent the pew covered by the indenture, to any person of the Jewish faith, without the consent of the *1099 party of the first part. Paragraph designated “ 5 ” provides that no child or children of the grantee, who have married not in accordance with the Mosaic law, may become ‘ ‘ legal grantees ” to the pew “ after the death of the party of the second part.” In such case the party of the first part agrees to refund to such child or children all payments made to that date on the purchase of the pew. Paragraph “ 6 ” provides that the party of the second part may transfer his rights in the pew herein, giving to the congregation preference over others in purchasing the same. The same paragraph also provides that if the grantee removes from the City of Rochester, the grantor may notify grantee that the grantor wishes to repurchase the pew ‘ ‘ the price was not to be lower than offered by any outside party ”. If the congregation has no desire to repurchase the property, the grantee may sell the same to any member of the Jewish faith.
These various provisions seem to me to show very clearly that each of the original grantees, by their payment and the receipt of the indenture, acquired a vested property interest and upon the sale of the property by the congregation, is entitled to payment of such sum as may be equitable by reason of the destruction of the property in which he had an interest. It is to be noted that the edifice in which the claimants’ ancestors had purchased sittings, was not destroyed by age, by fire or by any casualty. Had that occurred, under authority and by equitable principles, a claim for indemnity might not now be recognized. (See cases collected and cited in Mayer v. Temple Beth El, 23 N. Y. S. 1013.) For other discussions of the same subject see, also, St. Paul’s Church v. Ford (34 Barb. 16) and Voorhees v. Presbyterian Church of Amsterdam (8 Barb. 135).
There was no testimony given as to the present-day value of these pews. None has recently been sold, most of the sales having occurred about 40 years ago and then for various and greatly differing sums.
Nor was any evidence given as to the value of corresponding sittings in other temples or synagogues in the City of Rochester.
In each case the father and mother of the respective claimants enjoyed the use of these pews for many years (although not one thousand). It is probable that comparable sittings would have today a much higher market value. All in all I feel that if each of the representatives of the three original pew owners receive from the congregation the amount which his or their ancestors originally paid for the pew, they should be content and such disposition in my view is equitable.
*1100 Accordingly judgment may enter, without costs and without interest, against the congregation as follows: in favor of Max Cohen for $117.50; in favor of Nathan Lapides and his sister, Mrs. Lieberman, for $67.50 each; in favor of Morris Flaum, surviving husband of Bluma Flaum, $41.66; and in favor of the five surviving children of Bluma Flaum and one surviving grandchild (only surviving issue of a deceased child), for the sum of $13.89 each.
Any judgment presented for signature will bear the written marginal approval as to form by counsel for the congregation. If such approval cannot be secured, the form of the judgment will be settled on five days’ written notice on voluntary appearance of both parties.